Davis, Judge,
delivered the opinion of the court:[1]
This case, which involves claims totaling $5,156,144.50,[2] grew out of the deactivation of Fort Polk, Louisiana, by the Department of the Army in 1958. At the time when the decision to deactivate Fort Polk was made, a large housing project, which was to consist of 2,000 dwelling units for the use of military personnel at Fort Polk, was being constructed ’tinder a contract that had previously been made by the Corps of Engineers pursuant to the provisions of the Cape-hart Act.[3] The housing contract was terminated by the Corps of Engineers on February 5,1958, after which numerous claims for damages were submitted to the Government. Most of the claims (from a numerical standpoint) were settled administratively; and the claims asserted in the present litigation remain for disposition because the particular claimants and the administrative agency could not agree on the amounts due the claimants. This suit therefore involves only the residue of the claims.
I
An unusual feature of the case is that the financial interests of the plaintiff, a joint venture consisting of eight individuals operating under the name of G. L. Christian and Associates, were not affected in any way by the termination *5 of the Fort Polk housing contract. In order to explain this anomalous situation, the events that transpired in connection with the making of the contract will be summarized in some detail.
Pursuant to an invitation for bids issued by the District Engineer in charge of the Galveston District of the Corps of Engineers, the plaintiff, on November 16, 1956, submitted a bid on the construction of the Fort Polk housing project under the Capehart Act. The plaintiff’s bid consisted of a basic bid plus certain added items. The District Engineer determined that the plaintiff was qualified by experience and financial responsibility to construct housing under the Cape-hart Act, and that its bid was the lowest acceptable bid submitted in response to the invitation. The plaintiff’s bid was thereupon accepted by the District Engineer in his capacity as contracting officer for the Government. The acceptance was in the form of a “letter of acceptability” dated December 17,1956.
After its bid for the construction of the Fort Polk housing project was accepted, the plaintiff approached the H. B. Zachry Company in about January 1957 and endeavored to interest that company in forming a joint venture with the plaintiff to construct the project. Zachry was not interested in forming a joint venture with the plaintiff, and so informed it. However, Zachry did indicate a possible interest in obtaining an assignment of the Fort Polk housing project from the plaintiff and handling the job in its entirety. After further discussion, the plaintiff granted Zachry an option to acquire the plaintiff’s entire interest in the Fort Polk project for $250,000.
Following these negotiations between the plaintiff and Zachry, the latter approached the Centex Construction Company, Inc., in about February 1957, and proposed that Centex enter into a joint venture with Zachry for the construction of the Fort Polk project. Both Zachry and Centex, which were highly competent construction companies with extensive experience in large-scale enterprises, made estimates regarding the prospective cost of constructing the project and the probable margin of profit in the job, under the price fixed in the plaintiff’s bid and in the letter of acceptability. Upon *6 .the basis of these calculations, Zachry and Centex concluded that the project was feasible and potentially profitable. Consequently, they decided to take over the Fort Polk housing job from the plaintiff and construct the project as a joint venture.
In furtherance of the decision made by Zachry and Cen-tex, Zachry exercised its option to acquire the Fort Polk project from the plaintiff for $250,000. A document on this matter was signed by Zachry and the plaintiff on March 14, ,1957. This document provided that the consideration of '$250,000 was to be paid by Zachry to the plaintiff as follows: $100,000 was to be paid “in cash upon approval by the proper .governmental agencies of this assignment,” an additional :$75,000 was to be paid within 9 months, and the final installment of $75,000 was to be paid within 18 months. The document declared that, on the basis of such consideration, “Assignors [the plaintiff] hereby assign, transfer, set over .and deliver unto H. B. Zachry Company all of their respective rights, titles and interest held or claimed by Assignors or either of them in and to” the Fort Polk housing job.
A written agreement for the construction of the Fort Polk housing project as a joint venture was entered into by Zachry ,and Centex on April 9, 1957. This agreement provided (among other things) that Centex would be the managing member of the joint venture and would be in charge of the ■construction of the project; that such funds as might be required by the joint venture for construction would be ■advanced in the proportions of one-third by Zachry and two-thirds by Centex; and that the profits (or losses) resulting from construction would be shared by the joint venturers in the proportions of one-third to Zachry and two-thirds to Centex.[4]
Information regarding the existence of the agreements between the plaintiff and Zachry and between Zachry and •Centex was furnished to the District Engineer by the attorney for Centex-Zachry at a conference in Galveston. The District Engineer orally expressed approval of the plan for the takeover of the Fort Polk housing job by Centex-Zachry from the plaintiff. It was agreed at the conference that *7 the takeover would be accomplished by means of a formal assignment of the Fort Polk housing contract (when made) from the plaintiff to Centex-Zachry. Subsequently, however, higher authority in the Department of the Army took the position that a housing contract under the Capehart Act ■could not be assigned.[5] Thereupon, another conference was held in Galveston between the attorney for Centex-Zachry and the District Engineer. At this conference, it was agreed (subject to the approval of higher authority in the Department of the Army) that the transfer of the Fort Polk housing job to Centex-Zachry would be accomplished by means of a subcontract from the plaintiff to Centex-Zachry that would cover the entire job.
After the approval of higher authority in the Department of the Army was obtained with respect to the plan for the transfer of the Fort Polk housing work from the plaintiff to Centex-Zachry by means of a subcontract covering the entire project, a document entitled “Agreement to Sub-Contract with Irrevocable Power of Attorney Attached” was entered into between the plaintiff and Centex-Zachry on June 27, 1957. .The agreement stated that the plaintiff relinquished “all its right, title and interest in and to the proposed contract” for the construction of the Fort Polk housing project; that Centex-Zachry “hereby assumes all of the rights and obligations of G.L. Christian and Associates under the Letter of Acceptability * *. * and the proposed contract, and further agrees to relieve and save harmless the said G. L. Christian and Associates from its obligations and responsibilities set forth in said Letter of Acceptability * * * and in the proposed contract”; and that Centex-Zachry “hereby covenant and agree to at all times save harmless and keep indemnified the said G. L. Christian & Associates * * * against any and all claims, suits, actions, debts, damages, costs, charges and expenses, * * * and against all liability, losses and damages of every nature whatsoever which G. L. Christian & Associates * * * shall or may at any time sustain or be put to by reason of the aforementioned letter of acceptability, * * * the proposed housing contract * * * , the Power of *8 Attorney * * * made a part hereof, and by the execution of this agreement.”
The power of attorney attached to and made a part of this “Agreement to Sub-Contract” irrevocably constituted and appointed Centex-Zachry as the plaintiff’s “true and lawful attorney * * * to do any and every act and execute any and every power that Principal * * * might or could do or exercise” in connection with the construction of the Fort Polk housing project, including the authority “to make application for and receive all sums of money due or to become due.” The instrument further stated that the plaintiff “hereby represents and agrees that said attorney in fact shall own and be entitled to all moneys and funds payable * * * under said Housing Contract, granting to said attorney in fact authority to collect said funds and to endorse all checks, bills or instruments in connection therewith.”
The plaintiff made a profit of $171,516.68 in disposing of the Fort Polk housing job to Centex-Zachry for $250,000, and did not have anything further to do with that project. When a formal contract to cover the construction of the Fort Polk housing project was prepared and signed on July 29, 1957, the plaintiff’s name was used as one of the parties to the contract, but the contract was signed on behalf of the plaintiff by Centex-Zachry. Thereafter, Centex (acting for Centex-Zachry) assumed the role of de facto prime contractor, negotiated with the persons interested in furnishing supplies, materials, or services in connection with the performance of the work under the contract, entered into numerous subcontracts, and began the construction of the project. None of these activities involved any expense to the plaintiff, and no claim is asserted against the Government in the present litigation on account of any losses allegedly sustained by the plaintiff in the form of unreimbursed expenses or anticipated profits.
The losses on which the present litigation is based were allegedly sustained by Centex-Zachry, the plaintiff’s nominal subcontractor, and by certain of Centex-Zachry’s subcontractors. These claimants are maintaining the present action in the name of the plaintiff, the nominal prime contractor, because they, having no privity of contract with the Govern *9 ment, cannot sue the Government in their own names. Severin v. United States, 99 Ct. Cl. 435, 442 (1943), cert. denied, 322 U.S. 733 (1944).
Generally, when a prime, contractor’s action against the Government is based on losses allegedly sustained by subcontractors, the possibility of recovery depends not only upon proof that the subcontractors actually sustained the alleged losses, but also upon proof that the prime contractor is liable to the subcontractors for the damages sustained by the latter. Continental Illinois National Bank v. United States, 121 Ct. Cl. 203, 244-245, 101 F. Supp. 755, 758 (1952), cert. denied, 343 U.S. 963; J. L. Simmons Company, Inc. v. United States, 158 Ct. Cl. 393, 397-98, 304 F. 2d 886, 888-89 (1962). In the present case, the plaintiff is not under any liability to its nominal subcontractor, Centex-Zachry, or to the latter’s subcontractors because of any losses which these claimants sustained when the Fort Polk hous-. ing contract was terminated by the Government. The plaintiff is insulated from such liability by the provision in the “Agreement to Sub-Contract” dated June 27, 1957, to the effect that Centex-Zachry will “at all times save harmless and keep indemnified the said G. L. Christian & Associates * * * against ariy and all claims, suits, actions, debts, damages, costs, charges and expenses, * * * and against all .liability, losses and. damages of every nature whatsoever” arising in connection with the Fort Polk housing contract.
However, the Government, though mentioning the point, has not stressed the u Sever in doctrine”, and we do not believe that it applies in these circumstances. With .the Government’s full knowledge and assent, Centex-Zachry became in actual fact the prime contractor; it signed the contract with the Government on behalf of the plaintiff and took over the entire role of prime contractor, including the management of performance in the six months prior to the cancellation; the defendant has settled with it a large part of the claims and has paid its subcontractors through it. For the purposes of the Severin doctrine”, the only fair position in this court is to treat Centex-Zachry as the prime contractor, to which the housing contract has been assigned with the defendant’s *10 full consent, and to disregard the nominal plaintiff as if it were no longer involved.
The question remains whether the Anti-Assignment Act absolutely precludes us from recognizing Centex-Zachry as the true party in interest. That statute (R.S. 3737, 41 U.S.C. 15) speaks imperatively of annulling any Government contract which is transferred, but it has nevertheless been interpreted as being solely for the Government’s own benefit and1 therefore as permitting the Government to assent to and recognize an assignment where it seems appropriate. Maffia v. United States, 143 Ct. Cl. 198, 203, 163 F. Supp. 859, 862 (1958); Thompson v. Commissioner, 205 F. 2d 73, 78 (C.A. 3, 1953); The Federal Mfg. and Printing Co. v. United States, 41 Ct. Cl. 318, 321 (1906); 16 Op. Atty. Gen. 277 (1879); 15 Op. Atty. Gen. 235, 245-6 (1877); 5 Op. Atty. Gen. 738-(1821); but cf. 19 Op. Atty. Gen. 186 (1888). That was certainly done here. Before and during performance of the contract and after its termination, the Government'recognized Centex-Zachry as the prime contractor and consented to its full participation in that capacity. It would be unreasonable for us to hold otherwise at this late stage. • •
II
The Government concedes that the claimants are entitled to be made financially whole, at least with, respect to all reasonable expenses that they incurred in preparing to perform work under the Fort Polk housing contract, in partially performing that contract from August 1957 to January 1958, and in meeting the situation that arose when the contract was formally terminated by the Government early in February 1958. The controversy revolves around the proper amounts of the claimants’ unreimbursed expenses and the legal question whether the claimants are entitled to recover for anticipated profits. At the time work was suspended in January 1958, the project was only 2.036% complete and the work was substantially behind schedule.[6]
The principal legal question is whether the claimants should be permitted to recover for anticipated profits. In *11 this connection, it is settled that, when the Government enters into a contract, it has rights and.it ordinarily incurs' responsibilities similar to those of a private person who is a party to a contract (Lynch v. United States, 292 U.S. 571, 579 (1934); Perry v. United States, 294 U.S. 330, 352 (1935)), and if the Government terminates a contract without justification, such termination is a breach of the contract and the Government becomes liable for' all the damages resulting from the wrongful act (United States v. Behan, 110 U.S. 338, 346 (1884); United States v. Spearin, 248 U.S. 132, 138 (1918)). The damages will include not only the injured' party’s expenditures and losses in partially performing the contract, but also, if properly proved, the profits that such party would have realized if he had been permitted to complete the contract. Broadbent Laundry Corp. v. United States, 56 Ct. Cl. 128, 132 (1921); see United States v. Behan, supra, at p. 344. The objective is to put the injured party in as good a position pecuniarily as he would have been in if the contract had been completely performed. Miller v. Robertson, 266 U.S. 243, 257 (1924); Needles v. United States, 101 Ct. Cl. 535, 619 (1944).
The right to recover for anticipated profits arisesj. however, only if the termination of the contract by the Government is wrongful and constitutes a breach. If the Government has reserved the right to terminate a contract for its convenience and then does so, there is no breach and normally there can be no recovery for the profits that would have been made if the Government had not exercised its reserved right. Davis Sewing Machine Co. v. United States, 60 Ct. Cl. 201, 217 (1925), affirmed 273 U.S. 324 (1927); College Point Boat Corp. v. United States, 267 U.S. 12 (1925); De Laval Steam Turbine Co. v. United States, 284 U.S. 61, 73 (1931).
In the present case, although the Fort Polk housing contract did not contain any provision expressly authorizing the Government to terminate the contract for its convenience, the Government contends that the contract should be read' as if it did contain such a clause. This argument is largely based upon Section 8.703 of the Armed Services Procure *12 ment Regulations.[7] Section 8.708 provided (with, an exception which is not pertinent here) that “the following standard clause shall be inserted in all fixed-price construction contracts amounting to more than $1,000,” and then proceeded to prescribe a detailed termination clause that began with the unequivocal declaration that “the performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Government,” and included a formula which did not encompass anticipated profits. As the Armed Services Procurement Regulations were issued under statutory authority,[8] those regulations, including Section 8.703, had the force and effect of law. See Williams v. Commissioner of Internal Revenue, 44 F. 2d 467, 468 (C.A. 8, 1930); Ex parte Sackett, 74 F. 2d 922-23 (C.A. 9, 1935). If they applied here, there was a legal requirement that the plaintiff’s contract contain the standard termination clause and the contract must be read as if it did. College Point Boat Corp. v. United States, supra; De Laval Steam Turbine Co. v. United States, supra; Monolith Portland Midwest Co. v. R.F.C., 178 F. 2d 854, 858 (C.A. 9, 1949), cert. denied, 339 U.S. 932 (1950).
■ The question of whether the regulations did govern the present contract depends upon Section 1.102 which limited their applicability to “purchases and contracts made by the Department of Defense * * * for the procurement of supplies or services which obligate affrofriated funds * * *” (emphasis added). Plaintiff contends that the Fort Polk housing contract did not “obligate appropriated funds.” It points out that the construction of housing projects at military installations under the Capehart Act was financed by means of loans from private lending institutions, and the contractors and subcontractors doing the construction work were paid out of the proceeds of such loans. In this case, the *13 money for the construction of the Fort Polk housing project was loaned by the Republic National Bank of Dallas, and the progress payments to Centex-Zachry and its subcontractors during the partial construction of the project were derived from the loans made by the Republic National Bank of Dallas.[9]
On the other hand, the Government insists that it was anticipated that the cost of constructing the Fort Polk housing project would ultimately be liquidated out of appropriated funds, because it was expected that the housing project would be completed, that the dwelling units would be occupied by military personnel assigned to Fort Polk, and that the quarters allowances of such military personnel (provided for in the annual appropriations to the Department of the Army) would be used to pay off, over a period of years, the loans made by the Republic National Bank of Dallas. Also, the loans made by the bank for the construction of the Fort Polk housing project were insured by the Federal Housing Administration, and from the beginning there was-at least a possibility that the F.H.A. might be compelled to make good on its commitments to the bank. As indicated in footnote 9, supra, on completion of the project or on termination of the contract, the Government specifically undertook (in the contract with plaintiff and accompanying agreements) to take over ownership of the mortgagor-corporations, to assume liability to the mortgagee for sums advanced,, and pay the outstanding notes. Moreover, Centex-Zachry *14 and its subcontractors have looked to the Government for Settlement and payment of their claims, and have received •very'large amounts’of appropriated funds in the partial settlements which have already been accomplished.
.Despite the unusual character of the contract, we have little difficulty in reading the Procurement Regulations, especially the rule requiring the insertion of the standard termination ■clause, as applying to the present type of agreement which ■could and would obligate appropriated funds, ultimately if not immediately. As we see it, the primary aim of the exclusion-of agreements which do not obligate appropriated funds is to put to one side the contracts of the conventional non-appropriated-fund instrumentalities of the armed forces, such as post exchanges, ships’ stores, officers’ clubs, and the like. The contracts of such agencies, although made by Government officers, do not bind appropriated funds, do not create a debt.of the United States, and may not be vindicated in this court. Borden v. United States, 126 Ct. Cl. 902, 116 F. Supp. 873 (1953); Pulaski Cab Co. v. United States, 141 Ct. Cl. 160, 157 F. Supp. 955 (1958); cf. Standard Oil Co. of California v. Johnson, 316 U.S. 481, 485 (1942). Those are the contracts which the Procurement Regulations declare are to be governed by their own separate rules. But the Regulations do not intimate that contracts which obligate the United States, and create a debt of the United States upon which suit is and can be brought, are also excluded simply because the use or obligation of appropriated funds is delayed and to some extent contingent. There is no doubt that the contract in this case bound the United States and that appropriated funds are importantly involved. The contractor and subcontractors did not hesitate to consider the United States, which of course pays through appropriated funds, liable for the cancellation of the contract. Large sums of appropriated monies were accepted after administrative settlement, and suit is now brought in a court whose judgments are payable through appropriated funds. It would be extraordinary, we think, if an agreement for the breach of which the United States must pay through appropriations was not deemed to obligate such funds.
The Congressional authorization for the contract, i.e., the *15 Capehart Act itself, recognizes affirmatively that appropriated funds will be involved. One section authorized “to b,e appropriated such sums as may be necessary to provide for payment to meet losses from such guaranty” given by the Defense Department to the Armed Services Housing Mortgage Insurance Fund.(12 U.S.C. 1748b(b) (2) (1958 ed.)). Another provision permits the military departments to use “appropriations for quarters allowances or appropriate allotments” for the payment of principal, interest, and other obligations of mortgagor corporations acquired by the Government (42 U.S.C. 1594b (1958 ed.)) (see footnote 9, supra). The Congress which passed the Capehart Act understood that in the long run the housing contracts thereunder could and would “obligate appropriated funds.”
We are not, and should not be, slow to find the standard termination article incorporated, as ..a matter of law, into plaintiff’s contract if the Regulations can fairly be read as permitting that interpretation. The termination clause limits profit to work actually done, and prohibits the recovery of anticipated but unearned profits. That limitation is a deeply ingrained strand of public procurement policy. Regularly since World War I, it has been a major government principle, in times of stress or increased military procurement, to provide for the cancellation of defense contracts when they are no longer needed, as well as for the reimbursement of costs actually incurred before cancellation, plus a reasonable profit on that work — but not to allow anticipated profits. In World War I, there was the Act of June 15, 1917, 40 Stat. 182, and the Dent Act of 1919, 40 Stat. 1272, both of which were held to prevent awards of prospective or possible profits. Russell Motor Car Co. v. United States, 261 U.S. 514, 523-24 (1923); Barrett Co. v. United States, 273 U.S. 227, 235 (1927); De Laval Steam Turbine Co. v. United States, 284 U.S. 61, 73 (1931). In World War II, the termination provisions used by the war contracting agencies (at least since late 1941) uniformly disallowed anticipated profits. See the opinion of Mr. Justice Douglas in United States v. Penn Foundry & Mfg. Co., 337 U.S. 198, 214-216 (1949), also 337 U.S. at 205-06; Office of Contract Settlement, A History of War Contract Termination and Settlements (July *16 1947), pp. 1, 27. The same policy against unearned profits-was embodied in the Contract Settlement Act (Act of July 1, 1944, 58 Stat. 649), Section 6(d) (5) of which directed war-contracting agencies, in settling terminated contracts, to award “such allowance for profit on the preparations made- and work done for terminated portions of the war contract as-ís reasonable under the circumstances”; the regulation issued by the Office of Contract Settlement specifically limited profit to preparations made and work done (32 C.F.R., 1944 Supp., Sec. 8006.3(c), p. 3065). Similarly, the Lucas Act of August 7, 1946, 60 Stat. 902, authorizing the departments- and agencies “to consider, adjust, and settle equitable claims-of contractors,” limited the amount of the claim to “losses-(not including diminution of anticipated profits) incurred ***.ü Since World War II, the standard termination clauses promulgated by the Defense Department and its constituent agencies have taken the same tack. Literally thousands of defense contracts and subcontracts have been settled on that basis in the past decades. •
This history shows, in our view, that the Defense Department and the Congress would be loath to sanction a large-contract which did not provide for power to terminate and at the same time proscribe anticipated profits if termination did occur. Particularly in the field of military housing, tied as-it is to changes and uncertainties in installations,[10] would it be necessary to take account of a possible termination in advance of completion, and to guard against a common law measure of recovery -which had been disallowed for so many years in military procurement. The experienced contractor in this case, for its part, could not have been wholly unaware that there might be a termination for the convenience of the Government, which the defendant would not deem a breach. Although the housing contract does not contain such an express provision, there are at least four references in it (and the accompanying agreements) to a “termination of the Housing Contract for the convenience of the Government” and to the Government’s assumption of certain obligations in that event. These references must have had some mean *17 ing. For many years unearned profits have not been paid upon such terminations, and we think it probable, too, that Centex-Zachry knew of that general policy.
For all of these reasons, we believe that it is both fitting and legally sound to read the termination article required by the Procurement Regulations as necessarily applicable to the present contract and therefore as incorporated into it by operation of law.
.It follows that Centex-Zachry and its subcontractors cannot recover unearned but anticipated profits; Under the standard termination clause (see finding 31(b)), which we hold governs this case, the contractor is entitled to the cost of the work performed and the cost of settling subcontract claims — plus 2% of the cost of materials and articles delivered to the site but not incorporated in the work and 8% of the balance of the cost (with the total profit not to exceed 6% of the whole cost of the work), unless the contractor would have sustained a loss on the entire contract in which event no profit is to be allowed. This is the guide for ascertaining Centex-Zachry’s profit. Profit for the subcontractors should be allowed on the same basis.
Since the parties did not apply the termination article in their administrative settlements and the case was not tried in this court on that principle, it may be impossible or overly difficult at this stage, to comply precisely with all the terms of the article or fully to accord with the general practice which has grown up under it. But we believe the article should be applied as nearly as it can reasonably be to the determination of allowable profit and with greater leeway, if necessary, to the other problems which may arise. We leave to the Commissioner, under Rule 38(c), the actual determination of the amounts still owing (if any), under these standards, to Centex-Zachry and the subcontractors for earned profit. For the guidance of the parties and the Commissioner, we add simply that we are not impressed with the defendant’s faint suggestion that Centex-Zachry would have suffered a loss on the entire contract and that some of the subcontractors would have been in the same position.
*18 III
There are a few items of cost, actually incurred, as to which the parties still disagrée. With respect to Centex-Zachry, the Government disputes the allowance of the full $250,000 payment made by Centex-Zachry to the plaintiff, pointing out that $171,517 of that amount represents profit to the plaintiff and only $78,488 represents the costs of performance by plaintiff before it: assigned the contract (see finding 46). The Commissioner took account of this $171,517 profit by allowing it as a cost to Centex-Zachry but deducting it in computing the latter’s contemplated profit. In view of our disallowance of anticipated profits, we believe it preferable to include only the sum of $78,483, reflecting an actual' cost to performance, in the contractor’s costs. The defendant also attacks the allowance of $58,484 in legal fees, but wo see no reason to disturb the Commissioner’s finding that this was a reasonable allowance. We have also examined the few exceptions to the findings relating to the costs of the subcontractors of Centex-Zachry, but have not been persuaded that the Commissioner was wrong.
On costs (leaving aside profit under the termination clause) the result is that we find that Centex-Zachry has received $34,630 more than its incurred costs; and that, of the subcontractors, Air-Way Corporation is entitled to $1,270 for unreimbursed costs, Kitzman’s joint venture is entitled to $13,512.72 but owes the defendant $65,915.83 for plumbing materials, Mid West Contracting Company is entitled to $2,500, and Witte Gravel Company has been paid for all its costs.
Plaintiff is entitled to recover, on behalf of Centex-Zachry and the subcontractors, in accordance with and to the extent indicated in this opinion. The amount of the recovery, if any, on behalf of Centex-Zachry and the subcontractors will be determined pursuant to Eule 38 (c).
Durfee, Judge; Larawore, Judge; Whitaker, Judge; and Jones, Glvief Judge, concur.
findings of fact
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and *19 arguments of counsel, makes findings of fact as follows:
1. (a) The nominal plaintiff in-this case is a joint venture, which operates under the name of G. L. Christian and Associates and which is composed of the following individuals: G. L. Christian, H. A. Crabb, F. A. Hunter, O. Gerrard, Jr., A. J. Whipple, Paul H. Wolf, N. H. Mitchell, and Preston R. Plumb, Sr. (This joint venture will usually be referred to in subsequent findings as “the plaintiff.”)
(b) ■ The real claimants in the case are :■
(1) Centex Construction Company, Inc., and H. B. Zachry Company, a joint venture, both companies being corporations organized under the laws of the State of Delaware.- ■ •
(2) Air-Way Corporation, a corporation organized under the laws of the State of Ohio.
(3) Kitzman’s Plumbing & Heating,-Inc., Kitzman’s, Inc., Kitzman’s of Florida, Inc;,-and Kitzman’s Plumbing of Louisiana, Inc., a joint venture, the first two companies being corporations organized under the laws of the State of California, the third being a Florida corporation, and the fourth being a Louisiana corporation.
(4) Mid West Contracting Company, a proprietorship owned by B. F. Schoéneman.
(5) Witte Gravel Company, a corporation.
2. Pursuant to an invitation for bids (No. ENG-41-243-57-8) which had previously been issued by the District Engineer in charge of the Galveston District, Corps of Engineers, United States Army, the plaintiff on November 16,1956, submitted to the District Engineer at Galveston, Texas, a bid for the construction under the Capehart Act of a housing project that was to consist of 2,000 dwelling units for the use of military personnel at Fort Polk, Louisiana. The plaintiff’s bid consisted of a basic bid plus certain additive items.
3. It having been determined by the District Engineer that the plaintiff was qualified by experience and financial responsibility to construct housing under the Capehart Act and that the plaintiff’s bid was the lowest acceptable bid submitted in response to the invitation mentioned in finding 2, the plaintiff’s bid was accepted by the District Engineer, acting for the defendant. The acceptance was in the form of a letter of acceptability dated December 17, 1956.
*20 4. The plaintiff proposed to construct the Fort Polk housing project of 2,000 dwelling units as a single mortgage area. To that end, the plaintiff, shortly after its bid for the construction of the project was accepted on December 17, 1956, caused a mortgagor-builder corporation, known as the Fort Polk Housing Corporation, to be organized under the laws of the State of Delaware with a paid-in capital stock of $1,000, made arrangements with a mortgagee-lender acceptable to the Federal Housing Commissioner for the financing of the construction of the project, caused the mortgagee-lender to make application to the Federal Housing Administration for FHA insurance in connection with the project, and took other preliminary steps preparatory to the ultimate construction of the project.
5. The plaintiff, in about January 1957, approached the H. B. Zachry Company, a Delaware corporation doing business in the States of Texas and Louisiana, and endeavored to interest that company in joining with the plaintiff in a joint venture to construct the Fort Polk housing project. The H. B. Zachry Company was and is a highly competent construction company, with extensive experience in large-scale enterprises. (For the sake of convenience, the H. B. Zachry Company will usually be referred to hereafter in the findings as “Zachry.”) Zachry was not interested in forming a joint venture with the plaintiff, and so informed the plaintiff. However, Zachry did indicate a possible interest in obtaining an assignment of the Fort Polk housing job from the plaintiff and handling the job in its entirety. After further discussion, the plaintiff granted to Zachry an option to acquire the plaintiff’s entire interest in the Fort Polk housing job for $250,000.
6. After Zachry had obtained from the plaintiff the option referred to in finding 5, Zachry, in about February 1957, approached the Centex Construction Company, Inc., a Delaware corporation doing business in the States of Texas and Louisiana, and proposed that the latter company enter into a joint venture with Zachry for the construction of the Fort Polk housing project. Like Zachry, the Centex Construction Company, Inc., was and is a highly competent and experienced construction company. (For the sake of con *21 venience, the Centex Construction Company, Inc., will usually be referred to in subsequent findings as “Centex.”) Zachry and Centex made estimates regarding the prospective cost of cpnstructing the Fort Polk housing project and the probable margin of profit that existed in the job under the price fixed in the plaintiff’s bid and the letter of acceptability. Upon the' basis of these calculations, Zachry and Centex concluded that the project was feasible and potentially profitable. Consequently, they decided to take over the Fort Polk housing job. from the plaintiff, and to construct the pro j ect as a j oint venture.
.7* (a) Zachry exercised the option referred to in finding 5 and entered into an agreement with the plaintiff under the date of March 14, 1957, for the acquisition of the plaintiff’s interest in the Fort Polk Housing job. .
(b) The agreement of March 14, 1957, between the plaintiff and Zachry provided in part as follows:
NOW, THEBEFOKE, in consideration of the premises and the consideration hereinbelow set out, Assignors [the plaintiff] hereby assign, transfer, set over and deliver unto H. B. Zachry Company all of their respective rights, titles and interest held or claimed by Assignors or either of them in and to the Fort Polk, Leesville, Louisiana, FHA No. 059-810035 Army No. 2, Project, described in letter of acceptability dated December 17, 1956, and letter extending the date for compliance there-, with dated February 27,1957, signed by W. P. McCrone, Colonel, CE, District Engineer, Corps' of Engineers, United States Army, Galveston District, Galveston, Texas, including, but not limited thereto, all contracts issued or-to be issued in connection therewith, and granting unto H. B. Zachry Company full and complete rights of subrogation in the premises. .
* ‡ * ‡ $
Upon the execution and delivery of this assignment to H. B. Zachry Company, and the approval thereof by the proper governmental agency, U. B. Zachry Company agrees to pay Assignors the aggregate sum of $250,000 at the times and in the following manner:
(a) $100,000 in cash upon approval by the proper governmental agencies of this assignment; and
(b) $150,000 in the form of a negotiable promissory note payable to the order of F. A. Hunter, Partner, in two installments, the first becoming due and payable on *22 or before nine months from date of this assignment, in the amount of $75,000, and the remaining installment to be due and payable on or before eighteen months from said date; said note to bear interest at the rate of 4% per cent per annum payable on the same dates as the installments of principal are due and payable.-
H. B. Zachry Company agrees to reimburse Assignors the $25,000 deposited by Assignors with the submission of their bid for said project, together with, the sum of $50,000 heretofore deposited by Assignors with the Federal Housing Administration District Office, Shreveport, Louisiana, as the processing fee in connection with the application for FHA mortgage insurance. ** *
8. A formal agreement for the construction of the Fort Polk housing project as a joint venture was entered into between Zachry and Centex under the date of April 9, 1957. This agreement provided (among other things) that Centex would be the managing member of the joint venture and would be in charge of the construction of the Fort Polk housing project; that such funds as might be required by the joint venture for the construction of the project would be advanced in the proportions of one-third by Zachry and two-thirds by Centex; that the profits (or losses) resulting from the construction of the project would be shared by the joint venturers in the proportions of one-third to Zachry and two-thirds to Centex; and that neither Zachry nor Centex would make any charges against the joint venture for ordinary overhead expenses or for time which might be expended by officers or employees of the respective companies in connection with the construction of the project, other than the officers and employees actually working on the project, but that Centex would be entitled to receive the amount of $50,000 to reimburse it “for all home office administrative work and salaries of,, home office personnel in connection with the construction of this project.” (This joint venture will usually be referred to in subsequent findings as “Centex-Zachry.”)
9. At the time when the Centex-Zachry joint venture agreement of April 9, 1957, was entered into, Norman R. Crozier, Jr., was employed to represent Centex-Zachry as attorney in connection with legal matters pertaining to the construction of the Fort Polk housing project.
*23 10. Information regarding the existence of the agreements between the plaintiff and Zachry and between Zachry and Centex was furnished to the District Engineer by the attorney for Centex-Zachry^at a conference in Galveston. The District Engineer orally expressed approval of the plan for the takeover ofthe Eort Polk housing job by Centex-Zachry from the plaintiff. It was orally agreed at the conference that the takeover would be accomplished by means of a formal assignment of the Fort Polk housing contract (when made) from the plaintiff to Centex-Zachry. Subsequently, however, higher authority in the Department of the Army , took the position that a housing contract under the Capehart Act could not be assigned. Thereupon, another conference was held in Galveston between the attorney for Centex-Zachry and the District Engineer. At this conference, it was agreed (subject to the approval of higher authority in the Department of the Army) that the takeover of the Fort Polk housing job by Centex-Zachry would be accomplished by means of a subcontract from the plaintiff to Centex-Zachry, which subcontract would cover the entire job.
11. (a) After the approval of higher authority in the Department of the Army had been'obtained with respect to the plan for the transfer of the Fort Polk housing job from the plaintiff to Centex-Zachry by means of a subcontract covering the entire job, a document entitled “Agreement to Sub-Contract with Irrevocable Power of Attorney Attached” was entered into between the plaintiff and Centex-Zachry on June 27, 1957.
(b) .The agreement mentioned in paragraph (a) of this finding provided in part as foil ows:
1. G. L. Christian, and Associates, hereby agree to subcontract to Centex Construction Co., .Inc., and H. B. Zachry Co., a Joint Venture, as general contractor all of the work provided for and contemplated in the aforesaid Letter of Acceptability * * * for the contract price therein set out, or as may be hereafter changed and relinquishes all its right, title and interest in and to the proposed contract * * * to be known and identified as Contract No. DA-41-243-eng-3361.
2. Centex Construction Co., Inc. and H. B. Zachry Co., a Joint Venture, accept this sub-contract from G. L. Christian and Associates together with all of the right, *24 title, interest, liabilities and obligations of G. L. Christian and Associates in and to the proposed Contract No, DA-41-243.-eng-3361 and hereby assumes all of the rights and obligations of G. L. Christian and Associates under the Letter of Acceptability * * * and the proposed contract, and further agrees to relieve and save harmless, the said G. L. Christian and Associates from its obligations and responsibilities, set forth in said Letter of Acceptability * * * and in the proposed, contract. # • . * * * *
4. As part of the consideration for .this agreement to sub-contract the whole of said work to be performed under the said housing contract hereinabove designated to Centex Construction Co., Inc. and H. B. Zachry Co., and for other good and valuable considerations, the receipt and sufficient of which are hereby acknowledged, the undersigned, Centex Construction Co., Inc., its successors and assigns, and H. B. Zachry Co., its successors and assigns, jointly and severally, hereby covenant and agree to at all times-save harmless and keep indemnified the said G. L. Christian & Associates, and each of said members constituting the joint venture of G. L. Christian & Associates, against any and all claims, suits, actions, debts, damages, costs,'charges and expenses, including Court costs and attorney’s fees, and against all liability, losses and damages of every nature whatsoever which G. L. Christian & Associates, or any of the members of the said joint venture, shall or may at any time sustain or be put to by reason of the aforementioned letter of acceptability, * * * the proposed housing contract No. DA-41-243-eng-3361, the Power of Attorney hereinbefore referred to and made a part hereof, and by the execution of this agreement.
(c) The “Irrevocable Power of Attorney” which was executed by the plaintiff and attached to the agreement of June 27, 1957, irrevocably constituted and appointed Centex-Zachry as the plaintiff’s:
true and lawful attorney * * * to do any and every act and execute any and every power that Principal * * * might or could do-or exercise to fully, effectually and finally carry out and comply with all the terms and provisions of that certain instrument entitled “Letter of Acceptability” dated December 17, 1956, ■ * * * and to carry out and comply with the same; to make and enter into a Housing Contract * * * and to carry out *25 and comply with all the terms, provisions and requirements thereof, and further to make, enter into, execute and deliver such other contracts, sub-contracts, guaranties, statements, documents and instruments as may be necessary or required to fully and finally complete the said Housing Contract * * * ; to make application for and receive all sums of money due or to become due in connection with or on account of the above and foregoing and to collect money, endorse checks * * * , sue, compromise, arbitrate, carry on or consummate any and all other negotiations whatever necessary or proper in connection with said project * * * ; and to do and perform all acts that are requisite and necessary in the execution, operation or maintenance of said projects * * * .
The power of attorney further provided in part as follows:
Principal * * * hereby represents and agrees that said attorney in fact shall own and be entitled to all moneys and funds payable * * * under said Housing Contract, granting to said attorney in fact authority to collect said funds and to endorse all checks, bills or instruments in connection therewith * * *.
12. As indicated in finding 4, it had been the plaintiff’s intention under, the original letter of acceptability dated December 17, 1956, to construct the entire Fort Polk housing project, which was to consist of 2,000 dwelling units, as a single mortgage area. After Centex-Zachry acquired the job, Centex-Zachry decided that, in order to reduce interest, insurance costs, and amounts withheld during construction, the project would be divided into eight separate mortgage areas. This change was satisfactory to the District Engineer.
13. The District Engineer, acting for the defendant, amended the letter of acceptability and reissued it to the plaintiff (in care of the attorney for Centex-Zachry) under the date of July 3, 1957. The letter of acceptability, as amended, provided as follows:
1. Your bid dated 16 November 1956 as modified by new wage rates in the amount of Thirty-two million, eight-hundred ninety-three thousand, one-hundred dollars ($32,893,100.00), (consisting of the basic bid and additive bid Items Nos. “a”, “b”, “c”, “d”, “e”, “g”, and “j”) after deductions or adjustments, if any, here *26 ■inafter specified and offering to construct through mortgage financing a housing project consisting of two-thousand (2,000) housing units at Fort Polk, Leesville, Louisiana, (Invitation No. ENG-41-243-57-8) under Title IV of the Housing Amendments of 1955 (Public Law 345,85th Congress) and Title V of the Housing Act of 1956 (Public Law 1020, 84th Congress, Chapter 1029, 2nd Session) has been determined by the Department of the Army (hereinafter referred to as the “Department”), after consultation with the Federal Housing Commissioner (hereinafter called the “Commissioner”), to be the lowest acceptable bid. Issuance of this amended Letter of Acceptability obligates you, at your own expense, and within the condition of the bid security, to:
a. Complete, in conformity with the requirements of the Federal Housing Commissioner, and your division of the project into eight (8) areas, eight (8) new corporations (hereinafter referred to as the “mortgagor-builder”) , in accordance with the laws of the State of Delaware, each corporation with paid-in capital stock of One thousand dollars ($1,000) and cause each mortgagor-builder to hold an immediate election of officers with authority on behalf of the mortgagor-builder to execute with the Department a lease of land from the Department and to execute the Housing Contract hereinafter ref erred to.
b. Immediately following each incorporation and election of officers, cause the stockholders of each mortgagor-builder to execute a stock transfer and escrow agreement in a form approved by the Commissioner.
c. Complete the necessary arrangements with mortgage lenders acceptable to the Commissioner as mortgagees for financing the cost, including your profit, of said eight (8) housing projects through the execution of mortgages and mortgage notes for a period of twenty-five (25) years and bearing interest at not greater than four percentum (4%) per annum, with the option of prepayment without penalty at the end of fifteen (15) years; cause each mortgagor-builder and each mortgage lender to enter into a Building Loan Agreement, a specimen form of which is attached to the Invitation for Bids; cause each mortgage lender to apply to the Commissioner for mortgage insurance; and take all steps necessary to cause the Commissioner to issue a Commitment for Insurance on or before 15 July 1957 to provide insurance during and after construction of each of said FHA housing projects, which are numbered as follows:

*27
Area No. FEA Project No.

i 059-81005
ii 059-81006
hi 059-81007
IV 059-81008
y 059-81009
VI 059-81010
VII 059-81011
VIII 059-81012
d.Cause each mortgagor-builder to execute at U.S. Army Engineer District, Galveston, Texas, a lease, a form of which is attached to the Invitation for Bids, with the appropriate officer of the Department. The contract numbers for these leases are as follows:

Area No. Contract Numbers

I ' DA-41-243-Eng-3463
II DA-41-243-Eng-3464
III DA-41-243-Eng-3465
IV DA-41-243-Eng-3466
V DA-41-243-Eng-3467
VI• ■ ' DA-41-243-Eng-3468
VII DA-41-243-Eng-3469
VIII DA-41-243-Eng-3470
e. Make arrangements for and obtain such title insurance policies or evidence of title, based upon the surveys of each FELA project site, and the description contained in the eight (8) leases mentioned in the preceding sub-paragraph, as may be required by such mortgagees and the Commissioner, or any of them. For this purpose, you may obtain from the Contracting Officer copies of surveys made in connection with the development of each FHA project.
f. Make all necessary arrangements with the Department or otherwise for. the utihty services required and be prepared at the closing (as defined in your bid) to furnish evidence in the form of written contracts or commitments that there will be made available to you during the construction period at each FHA project site such utility services as will be adequate for construction.
g. Be prepared to pay or cause to be paid prior to or at the closing: (1) to the Commissioner, the Commitment fee, filing fee, processing fee and the premium for mortgage insurance during the construction period, (2) to the Contracting Officer, the cost of the Architect-Engineer services for the design of each FHA project in the following amounts:

*28
Area No, Amount

I $45,350. 00
II 23,815. 00
III 41,803. 00
IV 38,003. 00
V 40,536.00
VI 27, 615. 00
VII 19,255.00
VIII 16,974.00
$253,351.00
the inspection fees in the following amounts for each area:

Area No. Inspection Fees

I $124,350.00
II 65,501. 00
III
IV 105,374. 00
V
VI 76,670.00
VII
VIII 46,998.00
$699,047.00
and a sum of One thousand dollars ($1,000) as consideration for each of the eight (8) leases.
h. Be prepared at the closing to furnish all the mortgagor-builders and the mortgagees with assurance of completion (utilizing FHA Form No. 2452-C, “Contract Bond — Dual Obligee”), providing separate penalty amounts for performance and payment of at least fifty percent (50%) of the total amount shown in Article 3 of the Contract, indorsed by a corporate surety acceptable to the Department, the mortgagee and the Commissioner.
i. Execute prior to or at the time of closing the Housing Contract and all other documents required to be executed or delivered by you at such closing.
j. Cause each mortgagor-builder and each mortgagee through their duly authorized representative prior to or at the time of closing to execute all documents required to be executed and delivered by them respectively at the closing.
k. Furnish the Contracting Officer with photostatic copies of each FHA Commitment for Insurance and each FHA Project Analysis as soon as possible after issuance thereof, and two (2) copies of all additional *29 closing papers required by the Commissioner or each mortgagee.
1. Furnish the eight (8) executed Trade Payment Breakdown, FHA Form No. 2536, including the signature thereof of the mortgagor-builder concerned.
m. Make application to the Contracting Officer for an appropriate wage determination for use in construction of the project. A copy of such wage determination, after having been obtained from the Secretary of Labor, shall be furnished to you and the Commissioner. Such wage determination will be used by the Commissioner to increase or decrease the bid price in the manner specified in your bid.
n. Acknowledge in writing receipt of this revised Letter of. Acceptability and attach an estimated schedule showing dates upon which you will have accomplished the several steps required above.
2. There are no deductions or adjustments resulting from alternates. '
3. Failure to perform all obligations required to be performed prior to the time prescribed for closing will be just cause for cancelling all commitments undertaken with you in connection with the entire hous-' irig project and for the recovery under your bid security of liquidated, damages in the sum of Twenty-five Thousand Dollars ($25,000.00). The decision of the. Contracting Officer shall be in-writing and shall be. final and conclusive unless, within thirty (30) days from the receipt thereof, you appeal in writing to the head of the Department or his duly authorized representative, and his decision shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive. In connection with any appeal under this paragraph you will be. afforded an opportunity to be heard and to offer evidence in support of your appeal.
4.. All payments to the Contracting Officer shall be certified or cashier’s checks made payable to the Treasurer of the United States, and all payments to the Commissioner shall be by certified or cashier’s checks made payable to the Commissioner of FHA but separate checks shall be made to each, respectively, for each FHA project and each fee as listed.
5. This Letter of Acceptability, as revised, commits the Department to execute eight (8) leases substantially in the form attached to the Invitation for *30 Bids upon compliance by you with, the provisions of subparagraph la hereof; and to enter into negotiations with you for any utility services to be furnished by the Department during the construction period;
6. You are required to be ready for the closing as early as possible after funds have been provided by Congress to the Federal National Mortgage Association, but not later than 29 July 1957, if funds have been provided to FNMA before that date, provided, that the Contracting Officer may extend the date of closing in writing upon written proof from you that the delay was caused by conditions beyond your control, and any dispute concerning such an extension will be settled in the manner provided for settling disputes under-paragraph 3 hereof.
14. Centex (acting for Centex-Zachry) employed a registered professional engineer to survey the site of the Fort Polk housing project and divide it into eight mortgage areas.
15. Seven additional mortgagor-builder corporations, (in addition to the Fort Polk Housing Corporation, previously established by the plaintiff) were formed by Centex (acting for Centex-Zachry) under the laws of the State of Delaware, and permits to do business in the State of Louisiana were obtained for them. The names of these additional mortgagor-builder corporations were Fort Polk Housing Corporation II, Fort Polk Housing Corporation III, Fort Polk Housing Corporation IY, Fort Polk Housing Corporation V, Fort Polk Housing Corporation VI, Fort Polk Housing Corporation VII, and Port Polk Housing Corporation VIII.
16. Centex (acting for Centex-Zachry) undertook negotiations with various lending institutions for the financing of the Fort Polk housing project. As a result of these efforts, a commitment was obtained from the Republic National Bank of Dallas, a national banking association, to make loans in an aggregate amount equal to the total contract price. However, the commitment contained a limitation to the effect “that at no time shall the aggregate of the balances owing upon all of the mortgage notes exclusive of such mortgage notes as have been finally endorsed for insurance by Federal Housing Administration exceed $20,000,000.00.”
Í7. The Republic National Bank of Dallas made application to the Federal Housing Administration for commit *31 ments by the FHA to insure the advances that were to be made by the bank to the eight mortgagor-builder corporations. Such application was approved by the Federal Housing Administration, which assigned a project number to each ■ mortgage area. The names of the mortgagor-builder corporations for the several mortgage areas, the FHA project numbers, and the respective amounts of the FHA commitments for the several mortgage areas were as follows:

18. The closing provided for in the letter of acceptability, as amended, took place in Shreveport, Louisiana, on July 29-30,1957, at the office of the Federal Housing Administration. As of that time, all the actions required of the eligible builder by subparagraphs a-n of paragraph 1 of the letter of acceptability, as amended (see finding 13), had been taken by Cen-tex (acting for Centex-Zachry). On the occasion of the closing, all the required instruments were signed and delivered by the respective parties, and the mortgage notes applicable to the eight mortgage areas and FHA projects were duly endorsed on behalf of the Federal Housing Commissioner.'
19. (a) One of the instruments signed and delivered on the occasion of the closing mentioned in finding 18 was a formal contract to cover the construction of the Fort Polk housing project. This contract was dated July 29,1957, and was numbered DA-41-243-eng-3361. It was entered into between the defendant (acting through the District Engineer as contracting officer), the plaintiff (acting through Cen-tex-Zachry) , and the eight mortgagor-builder corporations. (This contract will usually be referred to hereafter in the findings as “the contract.”)
(b) The contract recited (among other things) that the *32 plaintiff (eligible builder) bad submitted tbe lowest acceptable bid and bad been determined to be qualified by experience and financial responsibility to construct housing of the type covered by the contract; that the Department of the Army had issued a letter of acceptability to the eligible builder; that the housing project provided for in the contract was to be financed by eight FHA-insured mortgages; that the eligible builder had caused mortgagor-builder corporations to be incorporated and, following such incorporation, had caused the stockholders therof irrevocably to deliver to the eligible builder certificates representing all the capital stock of each mortgagor-builder for deposit in escrow with the mortgagee (the Eepublic National Bank of Dallas) and had further caused the officers and directors of each mortgagor-builder to execute and deliver to the eligible builder their respective resignations effective on the date when the capital stock of the mortgagor-builder corporation was to be delivered to the Department of the Army, such resignations being deposited in escrow with the mortgagee; that the Department of the Army, contemporaneously with the delivery of the contract, had delivered to each mortgagor-builder a lease of the land upon which each corresponding FHA project covered by the contract was to be constructed; that each mortgagor-builder had made arrangements for the financing of the construction “of its corresponding FHA projects covered by this Housing Contract with one or more mortgage lenders * * *, which arrangements contemplate, with respect to each FHA project, the execution of a mortgage on the leasehold interest, to be insured by the Commissioner, as security for the repayment of the amount of the mortgage indebtedness”; that the Federal Housing Commissioner had issued to the mortgagee a commitment for insurance, including insurance for advances during construction, with respect to each mortgage; and that the eligible builder had reimbursed the Department of the Army for the design and development costs incurred by the Department with respect to the housing project, and had also paid the Department the fees for administration* supervision, and inspection of the project. Under the terms of the contract, the plaintiff was to “furnish all labor, material, tools, plant and equipment, and perform all services *33 and work necessary to construct the housing project in accordance with the contract documents * * The work under the contract was to be commenced on or before August 9, 1957, and was to be “completed to the satisfaction of the Contracting Officer and the mortgagor-builder concerned within * * * 540 Calendar Days.” The total contract price was to be $32,893,100, which was to be paid to plaintiff by the eight mortgagor-builders, and which was the same amount that was fixed in the letter of acceptability, as amended, and in the FHA commitments.
(c) The contract did not contain any provision expressly authorizing either party to terminate the contract for the convenience of such party.
20. (a) After the contract was signed, Centex (acting on behalf of Centex-Zachry, which was nominally the subcontractor but which actually owned the whole job) assumed the role of de facto prime contractor, negotiated with the persons or companies named'below, and entered into subcontracts with them, or placed purchase orders with them, for the furnishing of supplies, materials,' or services in connection with the performance of the work under the contract:
(1) Air-Way Corporation, Centerville, Ohio.
(2) Kitzman’s Plumbing & Heating, Inc., Kitzman’s, Inc., Kitzman’s of Florida, Inc., and Kitzman’s Plumbing of Louisiana, Inc., a joint venture, La Mesa, California.
(3) Mid West Contracting Company, a proprietorship of B. F. Schoeneman, Dallas, Texas.
(4) Witte Gravel Company, Dallas, Texas.
(5) J. C. McBeath, Jackson, Mississippi. ’
(6) Armstrong Cork Co., Dallas, Texas.
(7) Barns Lumber Co., Dallas, Texas.
(8) Foxworth & Galbraith, Phoenix, Arizona.
(9) General Electric Supply Có., Dallas, Texas.
(10) Huey & Philp Co., Dallas, Texas.
(11) McCatee, Inc., Dallas, Texas.
(12) Salley Grocer Co., Inc., Bernice, Louisiana. ' '
(13) Simpson Redwood Co., Dallas, Texas. '■
(14) United Lumber Co., Portland, Oregon.
(15) Wood Protection Co., Houston, Texas.
*34 (16) J. C. McBeath and/or J. C. McBeath-Grant Corporation, co-venturers, Jackson, Mississippi.
(1.7) A & B Electric, Lake Forest, Illinois.
(18) L & A Mill & Supply Co., Austin, Texas.
(19) Louisiana Termite Control, Baton Bouge, Louisiana.
(20) W. E. Cluer Millwork Co., Phoenix, Arizona.
(21) Southwest Steel Products, Houston, Texas.
. (22) Guthrie Electrical Construction, Shreveport, Louisiana.
(23) H. H. Bain Booting Co., Inc., Shreveport, Louisiana.
(24) Piper-Weatherford Co., Dallas, Texas.
(25) Phil Bich Fan Mfg. Co., Inc., Houston, Texas.
(26) American Concrete Company, Louisville, Kentucky.
(27) Klaas Bros., Inc., Phoenix, Arizona.
(28) United Tile Co., Inc., Shreveport, Louisiana.
(29) Southern Pine Panels, Inc., Princeton, Louisiana.
(30) S & S Contractors, Seattle, Washington.
(31) Irving L. Peabody, Houston, Texas.
(32) John Abney, Arlington, Texas.
(33) Texboro Cabinet Corporation, Mineral Wells, Texas.
(34) Delta Paving Company, Dallas, Texas.
(35) Dallas Title & Guaranty Company, Dallas, Texas.
(36) Aetna Casualty and Surety Company, Dallas, Texas.
(37) Standard Accident Insurance Company, Dallas, Texas.
(b) One of the subcontracts referred to in paragraph (a) of this finding was between Centex (acting on behalf of Centex-Zachry) and the Air-Way Corporation. Under this subcontract, which was dated October 8, 1957, the Air-Way Corporation agreed to install the heating systems in the 2,000 housing units at the Fort Polk housing project for $777,757. The amount to be paid to the Air-Way Corporation was subsequently reduced to $772,757 by an agreement of the parties made on December 12,1957.
(c) Centex (acting for Centex-Zachry) entered into eight subcontracts on or about October 4,1957, with the Kitzman’s joint venture for the latter to furnish all the necessary labor, materials, and equipment and to perform all the necessary work required to install plumbing and gas fittings in the *35 bousing units within tbe eight mortgage areas that comprised the Fork Polk housing project. The' total amount payable to the Kitzman’s joint venture under the eight subcontracts was $1,939,200.
(d) Centex (acting for Centex-Zachry) entered into eight subcontracts on or about August 23,1957, with the Mid West Contracting Company for the installation by the latter of water, sewer, gas, and storm-drainage facilities in the eight mortgage areas comprising the Fort Polk housing project. The total price to be paid to the Mid West Contracting Company under the eight subcontracts was $1,662,337.77.
(e) Centex (acting for Centex-Zachry) made an oral subcontract with the Witte Gravel Company under which the latter company was to furnish all the drainage-fill material required in the construction of the Fort Polk housing project at a price of $3.35 per cubic yard, less a discount of 10 cents per cubic yard for prompt payment.
(f) Centex (acting for Centex-Zachry) entered into a subcontract with the American Concrete Company and the latter, in turn, made an oral sub-subcontract with the Witte Gravel Company whereby the Witte Gravel Company was to furnish all the sand and gravel required by the American Concrete Company in the performance of its subcontract, at a price of $3.35 per cubic yard for sand and $4.10 per cubic yard for gravel, less a discount of 10 cents per cubic yard in each instance for prompt payment.
(g) Centex (acting for Centex-Zachry) entered into a subcontract with the Delta Paving Company and the latter, in turn, entered into a written sub-subcontract with the Witte Gravel Company under which the Witte Gravel Company was to furnish 22,109 cubic yards of sand and 37,586 cubic yards of gravel to the Delta Paving Company at a price of $3.35 per cubic yard for sand and $4.10 per cubic yard for gravel, less a discount of 10 cents per cubic yard in each instance for prompt payment.
21. Work under the contract was commenced by Centex (acting for Centex-Zachry) on or before August 9, 1957, in accordance with the provisions of the contract.
22. After the work in connection with the construction of the Fort Polk housing project under the contract had been *36 in progress for approximately 5 months, Centex received the following telegram from the contracting officer on January 18,1958:
All work under your contract No. DA-41-243-eng-3361 is hereby suspended immediately and until further notice. Pending such further notification you will cease all work. Place no further orders or subcontracts for materials, services or supplies. Suspend all orders on subcontracts for services, materials and supplies relating to this contract and spend no further money under this contract directly or indirectly or make any further commitments to obligate any further monies under this contract except as is necessary for the preservation and protection of supplies and materials on hand or enroute.
23. Upon receiving the telegram mentioned in finding 22, Centex promptly notified each subcontractor, supplier, and materialman of the suspension of the work under the contract by virtue of such telegram. All progress in the construction of the Fort Polk housing project thereupon came to a standstill pending the receipt of further instructions from the contracting officer or higher authority in the Department of the Army. At that time, the project was only 2.036 percent complete, and the work was substantially behind schedule.
24. The reason for ordering the suspension of the work finder the contract was stated as follows in a letter from the Secretary of the Army to the Honorable Allen J. Ellen-der, United States Senator from Louisiana:
The resources in manpower and money scheduled to be made available to the Army have made it necessary for the Department of the Army to re-evaluate the use being made of its present installations. * * *
Since Fort Polk is included in the installations currently being examined, I feel that I should inform you regarding an action which the Army has of necessity just taken. Instructions have been issued to suspend further construction on the Capehart Housing Project at Fort Polk. This has been done to preclude commitment of additional funds on a project which may have to be cancelled. While much preliminary work has been accomplished under the current contract, no houses have yet been erected.
*37 25. (a) On January 20, 1958, Centex-Zachry sent the following telegram in the plaintiff’s name to the contracting officer:
Eetel 1/18/58. Contract DA-41-243-eng-3361 Fort Polk Capehart housing project. In accordance with the above we are notifying subcontractors suppliers and materialmen of your telegram. You are advised however that we are ready, able and willing to continue performance of contract to completion and the suspension or cessation of work will result in increased cost and damage for which we will expect full indemnification by the United States.
(b) A copy of the telegram set out in paragraph (a) of this finding was transmitted by wire to the Secretary of the Army by Centex-Zachry on January 20, 1958.
26. In an effort to resolve the dilemma in which Centex-Zachry found itself because of the unexpected suspension of the work under the contract, the attorney for Centex-Zachry, as soon as the necessary arrangements for such conferences could be made, conferred with the contracting officer in Galveston and with the Secretary of the Army in Washington, D.C. At the conference with the Secretary of the Army, which was held on or about January 22,1958, the Secretary was informed that firm subcontracts or other commitments, which involved a total of more than $14,000,000, had been made in connection with the construction of the Fort Polk housing project; that one subcontractor had purchased a lumber mill in the State of Oregon in order to supply lumber for the project; that another subcontractor had spent a considerable sum of money in putting up a batching plant at the project site in order to furnish ready-mix concrete; that another subcontractor had made substantial expenditures'in order to supply gravel for the project; and that the aggregate amount of the claims that would be filed against Centex-Zachry because of the discontinuance of the work under the contract could not be accurately predicted. The Secretary’s attention was called to the fact that the telegram of January 18,1958, left the situation uncertain as to whether work under the contract would or would not be resumed at a later time. However, no definite guidance for Centex-Zachry was received from the Secretary of the *38 Army at'thé time, as the future of Fort Pólk was still under consideration in the Department of the Army.
27. On February 5, 1958, the contracting officer sent the following telegram to the plaintiff and Centex-Zachry:
Contract No. DA-41-243-eng-3361 is hereby terminated for the convenience of the Govt. You will take all necessary steps to terminate and obtain proposals for the settlement of all outstanding commitments to subcontractors and suppliers and make no further commitments under this contract except as is necessary for the preservation and protection of supplies and materials on hand or enroute. Letter and instructions follow.
28. The telegram of February 5, 1958, was supplemented by a letter dated February 7, 1958, from the contracting officer to the plaintiff and Centex-Zachry. This letter stated as follows:
1. Effective Date of Termination: This letter will confirm the Government’s telegram to you dated 5 Feb 58 terminating in its entirety your Contract No. DA-41-243-eng-3361 (hereinafter referred to as “the contract”) for the convenience of the Government. Such termination is effective on the date and in the manner stated in such telegram, reference to which is hereby made.
2. Cessation of Worh and Notification to Your Im- . mediate Subcontractors:
a. You shall stop all work, make no further shipments, and place no further orders in connection with the contract, except (1) to the extent that you may wish to retain and continue any work in process or other materials for your account, or (2) to the extent the Contracting Officer authorizes you to continue work in process for reasons of safety or to clear (or avoid damage to) equipment, or to avoid immediate complete spoilage of work in process having a definite commercial value or otherwise to prevent undue loss to the Government. If you believe the authorization referred to in subparagraph (2) above is necessary or advisable, you should immediately notify the Contracting Officer by telephone or personal conference and obtain instructions. You shall keep adequate records of your compliance with this paragraph 2(a) showing (i) the date you received your Notice of Termination, (ii) the effective date of such termina *39 tion and (iii) the extent of completion of performance on such effective date.
b. You shall give notice of termination to each of your immediate subcontractors (including suppliers) who will be affected by the termination of your Contract. In such notice, you shall (1) give him the number of your Contract with the Government, (2) state that it has been terminated for the convenience of the Government, (3) give him the name and address of the Contracting Officer, (4) instruct him to stop all work, to make no further shipments, to place no more orders, and to terminate all subcontracts under this contract with you (subject to the same exceptions stated in paragraph 2(a), (5) direct him to submit his settlement proposal promptly in order to expedite settlement, and (6) request him to give similar notice and instructions to his immediate subcontractors..
3. The office named below will be in charge of the settlement of your claim. Further instructions will follow.
4. Please acknowledge receipt of this Notice as shown below.
29. After the telegram and letter mentioned in findings 27 and 28 were received, Centex promptly notified all subcontractors, suppliers, and materialmen regarding the termination of the contract and the consequent cancellation of all subcontracts and purchase orders.
30. The termination of the contract was not due to any fault on the part of Centex or of Centex-Zachry or of the plaintiff. Centex (acting for Centex-Zachry) was ready, willing, and able to complete the contract, and would have done so if the contract had not been terminated by the defendant. However, as the job was substantially behind schedule at the time when the work was suspended, and as bad weather conditions prevailed in the Fort Polk area during a substantial part of the remaining period allowed by the contract for the completion of the work, it is estimated that a delay would have been experienced by Centex in completing the job, beyond the time fixed by the contract for the completion of the work.
31. (a) On February 14, 1958, the contracting officer wrote a letter to the plaintiff and Centex-Zachry, stating in part as follows:
*40 Reference is made to our telegram transmitted to you on 5 February 1958 terminating the above-referenced contract, and our letter dated 7 February 1958 confirming such telegram.
Inclosed is a copy of the standard termination clause for fixed-price contracts. To facilitate tbe settlement of this terminated contract at an administrative level, you are requested to examine this clause and indicate whether you would be agreeable to its incorporation into the contract by modification. If agreeable, such action would require the prior approval of our higher authority.
(b)The “standard termination clause for fixed-price contracts” referred to in the letter of February 14, 1958, was the clause prescribed by Section 8.703 of the Armed Services Procurement Regulations (which comprised Subchapter A of Chapter I of Title 32, CFR (Rev. 1954)). That section provided in part as follows:
§ 8.703 Termination clause for fixed-price construction contracts. The following standard.clause shall be inserted in all fixed-price construction contracts amounting to more than $1,000, except that Contracting Officers may, at their discretion, omit the termination clause from fixed-price construction contracts under $5,000 when the probability of termination for convenience is remote, as in contracts for repair, improvements, or additions to existing structures: •
TERMINATION FOR CONVENIENCE OE THE GOVERNMENT
• (a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
ijc ijt % iji #
(c) After receipt of a Notice of Termination, the Contractor shall submit, to the Contracting Officer its termination claim, in the form and with the certification prescribed by the Contracting Officer. * * *
(d) Subject to the provisions of paragraph (c), the Contractor and the Contracting Officer may agree upon *41 the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this clause, which amount or amounts may include a reasonable allowance for profit. * * *
(e) In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph (d) upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, the Contracting Officer shall determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination and shall pay to the Contractor the amounts determined as follows:
(1) In respect of all contract work performed prior to the effective date of the Notice of Termination, the total (without duplication of any items) of—
(1) The cost of such work;
(ii) The cost of settling and paying claims arising out of the termination of work under subcontracts or orders * * *; and
(iii) A sum, equal to 2 percent of the part of the amount determined under subdivision (i) which.represents the cost of articles or materials delivered to the site but not incorporated in the work in place on the effective date of the Notice of Termination, plus a sum equal to 8 percent of the remainder of such amount, but the aggregate of such sums shall not exceed 6 percent of the whole of the amount determined under subdivision (i) above, which amount for purposes of this subdivision (iii) shall exclude any charges for interest on borrowings; Provided, however, That if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, no profit shall be included or allowed under this subdivision (iii) and an appropriate adjustment shall be made reducing the amount of the settlement to reflect the indicated rate of loss.
(2) The reasonable cost of the preservation and protection of property incurred pursuant to paragraph (b) (9) hereof; and any other reasonable cost incidental to termination of work under this contract, including expense incidental to the determination of the amount due to the Contractor as the result of the termination of work under this contract. * * *
*****
(g) The Contractor shall have the right of appeah under the clause of this contract entitled “Disputes, *42 from any determination made by the Contracting Officer under paragraphs (c) or (e) above * * *.
32. In reply to the letter of February 14, 1958 (see finding 31), Centex-Zachry wrote a letter in the plaintiff’s name under the date of March 3, 1958, to the contracting officer, stating in part as follows:
After the Eligible Builder entered upon the performance of said contract, without authority by statute, law or the contract, the United States wrongfully can-celled the same.
At all times, the undersigned, the Eligible Builder, was ready, able and willing to fully perform this contract.
* . * * # *
The undersigned is in a position to fully meet the burden of proof required by law as to its damages in the premises and such damages can and will be established with reasonable certainty.
You have heretofore presented to the undersigned an instrument in the nature of a modification of the above entitled and numbered contract and have requested that the undersigned agree to the same. The effect of such modification would (1) incorporate in the contract administrative termination procedure similar to that provided in the Armed Services Procurement Regulations, in derogation of our legal rights; (2) create a different measure of damages and procedure than that to which we are legally and contractually entitled; and (3) be in derogation of the rights of our subcontractors . and materialmen.
Therefore, we respectfully decline so to agree.
Notwithstanding the above and foregoing paragraph, the undersigned wishes to assure you that, without prejudice to our rights under the law, we will negotiate with you for a full, final and complete settlement of our rights and damages in the premises, provided, however, that such negotiations will not be unduly prolonged or delayed to our detriment and prejudice.
33. After receiving the letter mentioned in finding 32, the contracting officer on March 5,1958, wrote to the attorney for Centex-Zachry a letter which stated in part as follows:
Since you have declined to accept a modification to your contract to provide for an administrative settlement of - your termination claim, I must seek further instructions from higher authority on this matter.
*43 In the meantime, it would be appreciated if you would start compiling the subcontractors5 claims and your own for discussion with me.
34. After the letter referred to in finding 33 was received, Centex got in touch with all the subcontractors, suppliers, and materialmen, and requested that they submit their claims to Centex.
35. On March 20, 1958, the contracting officer wrote the following letter to the attorney for Centex-Zachry:
Reference is made to your letter dated 3 March 1958 advising that a modification incorporating a termination procedure into the contract would not be acceptable to the Eligible Builder. You conclude that without prejudice to your rights, you would be willing to negotiate toward a settlement without a termination clause.
In the interest of cooperation, and with a view toward a speedy and fair settlement of your rights under the terminated contract, I offer the following for your consideration :
a. Negotiation be carried on with the Eligible Builder of its claim and, with his consent, of as many subordinate claims as may be possible;
b. the subject matter of these negotiations will center, on establishing the out-of-pocket expenses incurred and a reasonable profit on work accomplished and effort expended ;
c. Any agreements representing settlements with subcontractors or suppliers will be evidenced by a supplemental agreement to the housing contract which will completely release the Government with respect to such settlements upon payment of the amounts indicated to the prime contractor, using an adaptation of form prescribed in ASPR 8-712.2 (previously furnished you);
d. If agreement can be reached on costs and not profit, the Contracting Officer can include what profit he deems reasonable for work accomplished and effort expended, in the proposed settlement;
e. in such cases (ref d, above), the settlement will be evidenced by a supplemental agreement but there will be included a provision that such agreement will not prejudice the claimant’s right to assert a claim for additional profit.
f. if any subcontractors or suppliers resist the efforts to accomplish settlements as indicated above, further attempt shall not be made to accomplish settlement and such parties will be listed as exclusions in any agreement with thé Eligible Builder.
*44 If the above approach meets with your approval, negotiations can begin soon after presentation of your claim, together with such subcontractor or supplier claims as you may wish considered at this time.
An early reply would be appreciated.
36. The reply of the attorney for Centex-Zachry to the contracting officer’s letter of March 20,1958, was dated March 24, 1958, and stated as follows: •
This will acknowledge receipt of your letter dated March 20, 1958, in connection with procedure for settlement of claims by virtue of the termination of such contract.
We respectfully decline to negotiate a settlement on the basis outlined by you.
Without prejudice, however, to the rights of ourselves, our subcontractors, suppliers and those claiming under them to pursue our legal remedies, we will negotiate with you for a speedy and fair settlement of our claim (including the claims of our subcontractors and suppliers, and those claiming under them) along the following lines: Upon receipt by us of our subcontractors’ and suppliers’ claims (which will necessarily include the claims of subcontractors and suppliers to such subcontractors and those claiming under them) we will file and present to you our claim and. the claims of the others. These claims shall be properly itemized and authenticated. Thereafter, if we, as the Eligible Builder, agree to take by way of settlement a lesser amount than that which we or any of us claim or to which otherwise we have a legal right under the law, then we are free to do so, and the government will thereupon be given a full and complete release with respect thereto upon payment of the agreed sum. With the consent of our subcontractors and suppliers and those claiming under them, it is agreeable to us that the government may settle the claims of such subcontractors, suppliers and those claiming under them and thereby and therefore relieve us or our bonding company from any liability in connection therewith. In the event that agreement is reached as to costs and expenses incurred in the performance of the contract and agreement cannot be reached as to the profit to which we are entitled, then it will be agreeable that the government pay us for such costs and expenses incurred and we will give the government a partial release as to the same which shall not include the profits to which we are entitled and shall provide that we may pursue our legal remedy to recover such profit. However, either we or *45 those claiming by, through and under us are free at any time to break negotiations with you without prejudice and pursue our legal remedies.
As prime contractor we cannot do anything or agree to anything in derogation of our rights and the rights of those claiming by, through and under us. We will negotiate with you along the lines as above set out, provided that we obtain the consent of those claiming under us as aforesaid and provided further that such negotiations are without prejudice to our respective rights to pursue our legal remedies.
37. After further discussion, an agreement was reached between the contracting officer and Centex-Zachry at a meeting in Dallas, Texas, on April 17, 1958, concerning the procedure that should be followed in an effort to settle the claims growing out of the termination of the contract. The terms of this agreement were incorporated in a letter which was dated April 17, 1958, was signed by the contracting officer, was addressed to the plaintiff and Centex-Zachry, and stated as follows:
This letter constitutes a memorandum of our understanding as to procedures in regard to negotiation in connection with the termination or cancellation of the above contract by the United States.
It is the desire of the Department of the Army to undertake the settlement by negotiation of the claims which may arise by reason of the termination of work under this contract. We recognize the position taken by the prime contractor with respect to the legal rights and remedies which they may have by reason of such action. We propose, therefore, to settle such matters as can be settled by agreement, reserving to you your full legal rights and remedies with respect to matters on which agreement cannot be reached. Insofar as subcontractors and suppliers or any who are claiming by or through the contractor, the same procedure will be followed, namely, upon receipt by the contracting officer of a copy of the claim, together with a copy of the obligating document on which such claim is based and an indication that the action proposed has the approval of the claimant and the prime contractor, that the contracting officer will undertake the settlement of such claim in whole or in part. Any such agreements will be evidenced by further modifications to the contract which will recite the terms of the agreements reached and will completely reserve to all parties all of their *46 rights with respect to matters on which agreement has not been reached.
It is suggested that with respect to claims other than that of the prime contractor, the prime contractor address a letter to such claimants substantially as follows:
“The Government desires to settle all matters arising out of the termination of the prime contract by negotiation and that unless objection is taken by you, we propose to forward your claim to the contracting officer who, after audit verification, will undertake the negotiation of a settlement directly with you or with any subcontractors or suppliers under you.
“This action in no way will prejudice any rights which you may have against us by reason of our contract or order with you.. In the event a full and complete settlement is not possible, the acceptance by you of a partial settlement limited to those matters on which agreement has been reached will not prejudice your rights against us with respect to those matters on which agreement has not been reached. Upon notification by you of the agreement reached with the contracting officer, we will take the necessary action to obtain funds from the contracting officer and will promptly transmit such funds when they are received. It is our desire that you cooperate with us in this matter as we consider the proposed action to be a speedy solution of a difficult situation. A prompt reply indicating your concurrence in the proposed procedure is desired.”
I, as the contracting officer, possess the authority to proceed as outlined herein, and I propose to take all necessary action to undertake within the limitations of reasonable time the complete settlement of all matters arising out of the termination of this contract, or failing in that, to reach a settlement on all matters on which an agreement can be reached; and in those areas wherein agreement cannot be reached, then, of course, you and your subcontractors may pursue their legal remedies without prejudice.
38. (a) In furtherance of the agreement referred to in finding 37, the defendant (acting through the District Engineer as contracting, officer), the plaintiff (acting through Centex-Zachry), and the eight mortgagor-builder corporations — i.e., all the parties to the contract — signed a document which was denominated a “Supplemental Agreement” and provided as follows:
This Supplemental Agreement, entered into this 17th day of April, 1958, by and among the United States of *47 America, acting by and through the Department of the Army (hereinafter called the “DEPARTMENT’*) and represented by the Contracting Officer, and G. L. Christian and Associates, represented by Centex Construction Co., Inc., and H. B. Zachry Co., a joint venture, attorney in fact, (hereinafter called the eligible builder) and Fort Polk Housing Corporation, Fort Polk Housing Corporation II, Fort Polk Housing Corporation III, Fort Polk Housing Corporation IV, Fort Polk Housing Corporation V, Fort Polk Housing Corporation VI, Fort Polk Housing Corporation VII, and Fort Polk Housing Corporation VIII, Delaware Corporations, (hereinafter called the Mortgagor-Builder) do hereby agree as follows:
WHEREAS, Contract No. DA-41-243-ENG-3361 was entered into on 27 July 1957 by and between the above named parties for the construction of 2000 family housing units at Fort Polk, Louisiana, under the provisions of Public Law 345,- 84th Congress, as amended; and
WHEREAS, the Department has terminated the performance of work under the contract; and
WHEREAS, the Eligible-Builder and those claiming by, through and under it may have claims by reason of such termination; and
WHEREAS, the Contracting Officer and the Eligible-Builder desire to settle by negotiation such claims, in whole or in part, and at the same time, without prejudice, reserve to the Eligible-Builder and those claiming by, through or under him the right to pursue any legal remedies which such parties may have arising but of such termination of the work under this contract on which agreement cannot be reached.
NOW THEREFORE:
It is agreed that to the extent any mutually agreeable settlements are negotiated further modifications to this contract will be entered into embodying the terms of such agreements and upon execution thereof the Department, notwithstanding any other provisions of this contract, will pay to the Eligible-Builder the sums agreed upon; Provided however, that there will be reserved in such modifications all rights and legal remedies as to any matters upon which mutual agreement has not been reached ana; Provided further, that the Eligible-Builder has the right to withdraw from such negotiations at any time without prejudice to pursue its legal remedies arising out of the termination of the work.
*48 IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.
(b) The agreement quoted in paragraph (a) of this finding was subsequently known as modification No. 1 to the contract.
39. (a) Pursuant to the agreement of April 17,1958 (see findings 37 and 38), negotiations for settlement agreements with subcontractors, suppliers, and materialmen were undertaken. When settlement agreements were made, they were incorporated in modifications to the contract, as follows:
(1) Under modification No. 2:
(1) Partial settlement with Kitzman’s Plumbing of Louisiana, Inc., in the amount of $50,000.
(ii) Partial settlement with Mid West Contracting Company in the amount of $40,000.
(iii) Partial settlement with Witte Gravel Company in the amount of $50,000.
(iv) Partial settlement with J. C. McBeath in the amount of $50,000.
(2) Under modification No. 3:
(i) Full settlement with Armstrong Cork Co. in the amount of $1.
(ii) Full settlement with Bams Lumber Co. in the amount of $1.
(iii) Full settlement with Foxworth & Galbraith in the amount of $936.88.
(iv) Full settlement with General Electric Supply Co. in the amount of $1.
(v) Full settlement with Huey & Philp Co. in the amount of $1.
(vi) Full settlement with Macatee, Inc., in the amount of $1.
(vii) Full settlement with Salley Grocer Co., Inc., in the amount of $358.
(viii) Full settlement with Simpson Redwood Co. in the amount of $1.
(ix) Full settlement with United Lumber Co. in the amount of $451.05.
*49 .. (x) Full settlement. with Wood Protection Co. in the amount of $1.
(8)Under modification No. 4:
Full settlement with J: C- McBeath and/or J. C. Mc-Beath — Grant Corporation, co-venturers, in the amount of $145,051.51.
(4) Under modification No. 5:
Full settlement with. A & B Electric in the amount of $11,000.
(5) Under modification No. 6:
Partial settlement with Mid West Contracting Company (on behalf of Central Culvert Corporation) in the amount of $10,470.
(6) Under modification No. 7:
Full settlement with L & A Mill & Supply Co. in the amount of $897.
(7) Under modification No. 8:
Full settlement with Louisiana Termite Control in the amount of $9,300.
(8) Under modification No. 9:
Partial settlement with W. R. Cluer Millwork Co. (on behalf of Hollow Tree Redwood Company) in the amount of $10,000.
(9) Under modification No. 10:
Full settlement with Bowles & Edens Supply Co. (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $4,000. .
(10) UndermodificationNo.il:
Full settlement with Southwest Steel Products in the amount of $23,000.
(11) Under modification No. 12:
(i) Full settlement with Dierks Forests, Inc. (second tier sub-subcontractor under W.R. Cluer Millwork Co.) in the amount of $12,750.
■ (ii) Full settlement with Ipik Door Company, Inc. (second tier sub-subcontractor under W. It. Cluer Millwork Co.) in the amount of $3,024.42.
(iii) Full settlement with Mauk Seattle Lumber Company (second tier sub-subcontractor under W. R. Cluer Millwork Co.) in the amount of $436.50 ($120 of the $436.50 was on *50 behalf of Weiser Lumber Company, third tier supplier to Mauk Seattle Lumber Co.).
(12) Under Modification No. lS:
Partial settlement with W. R. Cluer Millwork Co. (on behalf of Hollow Tree Redwood Company) in the amount of $6,464.
(13) Under modification No. 14:
Full settlement with Brown & Thompson (second tier sub-subcontractor under Mid West Contracting Company) in the amount of $6,500.
(14) After modification No. 15:
Full settlement with Guthrie Electrical Construction iii the amount of $33,359.63.
(15) Under modification No. 16:
Partial settlement with Witte Gravel Company in the amount of $40,000.
(16) Under modification No. 17:
(i) Full settlement with James B. Clow & Sons, Inc., (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $10,457.85.
(ii) Full settlement with Johns-Manville (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $3,287.66.
(iii) Full settlement with R. D. Wood Company (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $6,444.90.
(iv) Full settlement with J. L. Jolley Contracting Company (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $4,000.
(17) Under modification No. 18:
Full settlement with Central Culvert Corporation (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $10,898.37.
(18) Under modification No. 19:
(i) Full settlement with H. H. Bain Roofing Co., Inc., in the amount of $26,000.
(ii) Full settlement with Piper-Weatherford Co. in the amount of $4,500.
(iii) Full settlement with Phil Rich Fan Mfg. Co., Inc., in the amount of $6,500.
*51 (19) Under modification No. 20:
Full settlement with John Abney (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $9,700.
(20) Under modification No. 21:
Partial settlement with American Concrete Company in the amount of $100,000.
(21) Under modification No. 22:
Full settlement with International Paper Company (second tier sub-subcontractor under W. R. Cluer Millwork Co.) in the amount of $4,637.44.
(22) Under modification No. 23:
Full settlement with Klaas Bros., Inc., in the amount of $30,000.
(23) Under modification No. 24:
Full settlement with A. Y. McDonald Mfg. Co. (second tier sub-subcontractor under Mid West Contracting Co.) in the amount of $41,016.15 ($6,016.15 of the $41,016.15 was on behalf of Revere Copper and Brass Incorporated, third tier supplier to A. Y. McDonald Mfg. Co.).
(24) Under modification No. 25:
Full settlement with Hollow Tree Redwood Company (second tier sub-subcontractor under W. R. Cluer Millwork Co.) in the amount of $1,301.60.
(25) Under modification No. 26:
Full settlement with United Tile Co., Inc., in the amount of $15,000.
(26) Under modification No. 27:
Full settlement with Southern Pine Panels, Inc., in the amount of $11,200.
(27) Under modification No. 28:
Full settlement with Stanley Building Specialties (second tier sub-subcontractor under W.R. Cluer Millwork Co.) in the amount of $54,000.
(28) Under modification No. 29:
Full settlement with S & G Contractors in the amount of $19,000.
(29) Under modification No. 30:
Full settlement with American Concrete Company in the amount of $10,000 (excluded from this settlement was any *52 claim for costs which the American Concrete Company may have against Centex arising out of the claim of Witte Gravel Company under its agreement with the American Concrete Company, but included was the sum of $3,635.14 constitüting-payment in full of the amount due the Valley Electric Membership Corporation).
(30) Under modification No. 31:
Full settlement with Irving, L. .Peabody in the amount of $24,702.
(31) Under modification No. 32:
Full settlement with W. K. Cluer Millwork Co. in the amount of $90,000.
(32) Under modification No. 33:
Full settlement with John Abney in the amount of $24,000.
(33) Under modification No. 34:
Full settlement with Texboro Cabinet Corporation in the amount of $27,500.
(34) Under modification No. 35:
Full settlement with Delta Paving Company in the' amount of $30,000 (excluded from this settlement was any claim for costs which Delta Paving Company may have against Centex arising out of the claim of Witte Gravel Company under its agreement with Delta Paving Company, but included was the sum of $2,614.55 representing reimbursement of the bond premium paid by Delta Paving Company).
(35) Under modification No. 36: • •
Partial settlement with Witte Gravel Company under its agreements with Delta Paving Company, American Concrete-Company, and Centex in the amount of $35,398.56.
(36) Under modification No. 37:
Partial settlement with Air-Way Corporation in the amount of $786.56.
(b) The settlements referred to in paragraph (a) of this finding were effectuated by means of checks from the defendant drawn on appropriated funds and made payable to the various companies and individuals. The checks were transmitted by the defendant to Centex, which delivered the checks to, and obtained releases from, the several payees.
40. The. following claims growing out of the termination of the contract have not been disposed of by administrative *53 action, and they remain for disposition by the court in the present litigation:
(a) Claim of Centex-Zachry:
For unreimbursed costs_ $177,902. 67
For loss of anticipated profits- 4,163,844. 00
Total_ 4,341,746.67
(b) Claim of Air-Way Corporation:
For unreimbursed costs_ $3, 609. 00
For loss of anticipated profits_ 134,948. 95
Total_ 138,557.95
(c) Claim of Kitzman’s Plumbing & Heating, Inc., Kitz-man’s, Inc., Kitzman’s of Florida, Inc., and Kitzman’s Plumbing of Louisiana, Inc., a joint venture:
For unreimbursed costs_ $24,835.91
For loss of anticipated profits_ 366,476.17
Total_ 391,312. 08
(d) Claim of Mid West Contracting Company:
For attorney’s fee_ $12,500.00
For loss of anticipated profits_ 150,000.00
Total_ 162,500.00
(e) Claim of Witte Gravel Company:
For loss of anticipated profits_ $122, 027.80
41. (a) Centex-Zachry incurred reasonable costs aggregating $2,726,493 (1) in acquiring the Fort Polk housing job from the plaintiff, (2) in partially performing the contract, and (3) as a result of the termination of the contract by the defendant. These costs were as follows:
Payment to the plaintiff on account of contract costs incurred by plaintiff (see finding 46)_ $78,483
Architectural fees- 952,398
Engineering fees_ 56,798
Blueprinting & engineering supplies_ 3,001
Job engineering- 14,691
Site preparation- 125,448
*54 Drainage structure_ 10, 665
Utility distribution_ 34, 341
Electric power distribution_ 37,722
Miscellaneous material- 2
Plumbing_ 128,393
Miscellaneous iron- 7
Car & truck unloading_ 2,835
Job distribution- 1,350
Equipment maintenance_ $3,250
Equipment fuel_ 1,820
Utility expense_ 3,034
Field office personnel travel expense- 13,179
Expendable tools- $430
Miscellaneous items- 2,250
Ranges_ 13
Payroll taxes & insurance- 5,963
Builders risk & equipment insurance- 6,376
Performance bond- 57,041
Sales taxes_ 1,005
FHA commitment fees_ 98,754
Financing fees_ 783,967
Title & recording fees- 59,022
Leasehold expense- 8,070
Organization expense_ 2,724
Home office overhead- 30, 556
Supervision- 22, 914
Field office_ 16, 823
Temporary buildings- 16,470
Office supplies and expenses_ 3,045
Rental, local- 3, 934
Interest paid_ 78, 352
Legal fees- 58,484
Termination expense_ 2,883
Total_ 2,726,493
(b) The costs referred to in paragraph (a) of this finding were offset by progress payments that were made to Centex (for Centex-Zachry) under the contract in the aggregate amount of $2,761,123. These progress payments were received out of funds advanced by the Republic National *55 Bank of Dallas, as mortgagee-lender, to the eight mortgagor-builder corporations, the repayment of such advances being insured by the Federal Housing Administration. Centex-Zachry has thus been paid $34,630 above its reasonable costs, .which amount .should be credited to the defendant.
42. At the time of the termination of the contract on February 5, 1958, the Air-Way Corporation had not done any work or incurred any expenses in preparation for the performance of its subcontract relative to the installation of heating systems (see finding 20(b)). However, in pursuance of the agreement that was reached on April IT, 1958, con•cerning the procedure that should be followed in an effort to settle the claims growing out of the termination of the contract (see findings 37 and 38), the Air-Way Corporation incurred reasonable legal and accounting expenses amounting to $1,270 in preparing its claim for administrative consideration. The Air-Way Corporation has not received any reimbursement for these expenses.
43. (a) Prior to the time of the termination of the contract on February 5, 1958, the Kitzman’s joint venture had moved personnel and equipment to the site of the Fort Polk housing project, had constructed at the job site a plant for the prefabrication of fittings, had prefabricated a large number of plumbing trees, and had done other work looking toward the performance of the eight subcontracts referred to in finding 20 (c). .
(b) The Kitzman’s joint venture incurred the following reasonable costs (1) in partially performing the eight subcontracts referred to in finding 20(c) and (2) as a result of the termination of such subcontracts:
Material_$116,100. 52-
Labor- 11,778. 50'
Payroll taxes & welfare fund_ 593.71
State sales taxes- 2,322. 01
Miscellaneous direct expense_ 4, 675. 02
Insurance & bond_ 11,774.40
Utilities- 1, 002. 35-
Warehouse construction_ 5,460.12
Kepairs & maintenance_ 363.44
Gas. oil & grease- 1. 093.41
*56 Rent, equipment & facilities- 12, 529. 50
Small tools_ 2, 589.79
Production supplies- 1,663.77
Office supplies & expenses- 1, 677.49
Local taxes, licenses, & dues- 136.40
Employees benefits- 149. 87
Miscellaneous_ 71. 01
Supervision & office wages- 18,845. 55
Payroll taxes on supervision & office wages- 878.79
Professional services- 687. 50
Travel & entertainment_ 1, 521.71
Interest expense_ $5, 611.46
Claim of Mission Appliance Co- 477.50
Total_ 202,003. 82
Less purchase discounts rec’d- 2,017. 88
199,985. 94
The costs referred to above were partially offset by progress payments which the Kitzman’s joint venture received from Centex (acting for Centex-Zachry) in the aggregate amount of $186,473.22. Therefore, the unreimbursed costs of the Kitzman’s joint venture amounted to $13,512.72.
(c) In 1958, after the defendant had terminated the contract and after Centex (acting for Centex-Zachry) had terminated the eight subcontracts with the Kitzman’s joint venture referred to in finding 20(c), the Kitzman’s joint venture made an offer of $65,913.83 for some of the plumbing materials that were located at the site of the Fort Polk housing project. This offer was accepted by the defendant and the materials were turned over to the Kitzman’s joint venture by the defendant. No payment has been made by the Kitzman’s joint venture to the defendant in connection with this transaction.
44. Prior to the termination of the contract by the defendant on February 5, 1958, and the consequent termination by Centex (acting for Centex-Zachry) of the eight subcontracts referred to in finding 20(d), the Mid West Contracting Company had begun operations at the site of the Fort Polk housing project, had entered into sub-subcon *57 tracts with certain suppliers, and had ordered materials from other suppliers. The Mid West Contracting Company has been reimbursed for all the expenses that it incurred up to the time of the termination of the contract and of Mid West’s eight subcontracts; and all the claims of this company’s sub-subcontractors and suppliers have been satisfied. However, following the termination of the contract and of Mid West’s eight subcontracts, the Mid West Contracting Company incurred costs for reasonable legal fees amounting to $2,500 in connection with the disposition of the claims asserted by that company’s sub-subcontractors and suppliers, and in connection with the preparation of that company’s own claim for administrative consideration. The Mid West Contracting Company has not been reimbursed for these legal fees.
45. Prior to the termination of the contract on February 5, 1958, the Witte Gravel Company, in preparation for the furnishing of sand and gravel to Centex (for Centex-Zachry), the American Concrete Company, and the Delta Paving Company under the subcontract and the sub-subcontracts referred to in paragraphs (e), (f), and (g) of finding 20, had performed exploration work in an effort to find a deposit of suitable sand and gravel in the vicinity of Fort Polk, had located such a deposit, had leased the lands containing the deposit, had constructed a plant for the processing of the sand and gravel, and had begun to remove the overburden covering the deposit of sand and gravel. In doing so, the Witte Gravel Company incurred costs aggregating $125,398.86. The Witte Gravel Company has been reimbursed in full for these costs.
46. The plaintiff made a profit of $171,516.68 in disposing of the Fort Polk housing job to Centex-Zachry for $250,000 under the “Agreement to Sub-Contract with Irrevocable Power of Attorney Attached” dated June 27,1957 (see finding 11). Thereafter, the plaintiff did not incur any expenses, actual or potential, in connection with the partial performance of the contract or as a result of the termination of the contract by the defendant. The financial interests of the plaintiff were not affected in any way by the termination of the contract.
*58 CONCLUSION OF LAW
Upon the foregoing- findings - of ■ fact, ‘‘which are' made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, for the use and benefit of Centex Construction Company, Inc., and H. B. Zachry Company, a joint venture, and the various subcontractors, in accordance with the opinion herein. The amounts of recovery, if any, will be determined pursuant to Buie 38(c).

 This opinion borrows heavily from the careful opinion submitted by Commissioner Mastin G. White to the court, though we reach certain major conclusions different from his.

 The claims set out in the first amended petition aggregated $5,615,450.90, but adjustments were made in the claims at the time of the trial.

 This is the name commonly used to designate the provisions of law contained in (1) Title VIII of the National Housing Act, as amended and reenacted by Section 401 of the Housing Amendments of 1955 (69 Stat. 635, 646-651) and as further amended by Sections 501-506(a) of the Housing Act of 1956 (70 Stat. 1091, 1109-1110) ; (2) Sections 403-409 of the Housing Amendments of 1955 (69 Stat. at pp. 651-654), as amended by Sections 506(b)-509 and 511-512 of the Housing Act of 1956 (70 Stat. at pp. 1110-1112) ; and (3) Section 410 of the Housing Amendments of 1955, as added by Section 510 of the Housing Act of 1956 (70 Stat. at p. 1110).

 This joint venture will usually be retened to as “Centex-Zachry.

 This apparently was based upon the first paragraph of Section 3737 of the Revised Statutes, as amended (41 U.S.C. 15).

 The project was supposed to be completed In about 18 months after Its commencement in August 1957. The total contract price was $32,893,100.

 At the time with which we are concerned, the Armed Services Procurement Regulations comprised Subchapter A of Chapter I of Title 32, CFR (Rev. 1954).

 The Armed Services Procurement Act of 1947, 62 Stat. 21, 41 U.S.C., § 151, et seq. (1952 ed.), was the principal statute relied upon in issuing the regulations.

 The steps In a Capehart Act project are as follows: After deciding that a-housing project should be built at or in connection with a post on government-owned property, the Army (for example) would have preliminary plans prepared, secure a preliminary approval from F.H.A., and then issue an invitation for bids. A “letter of acceptability” would be issued to the lowest acceptable bidder (see findings 3, 13), requiring it, inter alia, to organize one or more mortgagor-builders which would lease the underlying land from the Government and make arrangements with a financial institution to finance-the project with a 100% mortgage. As construction proceeds, the mortgagor-builders draw money from the bank and pay the contractor. When the project is completed, the contractor will have received his full bid price and the mortgagor-builders will own the project, subject to a 100% mortgage to the financial institution which is the mortgagee. The stock of the mortgagor-builders, previously placed in escrow, will then be transferred to the Army. Thereafter, moneys appropriated to pay the housing allowances of personnel' assigned quarters in the project buildings are used to service the mortgage. The Government, as owner of the mortgagor-builders, is liable for the outstanding indebtedness and maintains and operates the housing.

 See Henry Barracks Housing Corp. v. United States, 150 Ct. Cl. 689, 698-99, 281 F. 2d 196, 201-02 (1960).